## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, 378 N. Main Avenue Tucson, AZ 85701; | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| DEFENDERS OF WILDLIFE, 1130 17th Street N.W. Washington, D.C. 20036; and | Case No.: _____ |
| ANIMAL LEGAL DEFENSE FUND, 525 East Cotati Avenue Cotati, CA 94931, | |
| Plaintiffs, v. | |
| KIRSTJEN M. NIELSEN, in her official capacity as Secretary of the U.S. Department of Homeland Security, 245 Murray Lane S.W. Washington, D.C. 20528; and | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, 245 Murray Lane S.W. Washington, D.C. 20528, | |
| Defendants. | |

## INTRODUCTION

1.     In this action, Plaintiffs Center for Biological Diversity, Defenders of Wildlife, and Animal Legal Defense Fund (collectively, "Plaintiffs") challenge the issuance of waivers on October 10, 2018 and October 11, 2018 by Defendant Kirstjen M. Nielsen, Secretary of the U.S. Department of Homeland Security ("DHS Secretary"), that purport to exempt (i) construction of

approximately 6.6 miles of border walls and associated infrastructure in Cameron County, Texas, and (ii) construction of approximately 18 miles of border walls and associated infrastructure in Hidalgo County, Texas, respectively (collectively, "the Lower Rio Grande Valley Border Wall Waivers") from compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., the National Wildlife Refuge System Administration Act ("NWRSAA"), 16 U.S.C. §§ 668dd–668ee, and numerous other statutory requirements.  *See* 83 Fed. Reg. 50,949 (October 10, 2018) ("Cameron County Waiver"); 83 Fed. Reg. 51,472 (October 11, 2018) ("Hidalgo County Waiver").

2.     In issuing the Lower Rio Grande Valley Border Wall Waivers, Secretary Nielsen invoked the authority purportedly contained in Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, Div. C, 110 Stat. 3009-546 (codified at 8 U.S.C. § 1103 note), as amended.  As detailed below, the Lower Rio Grande Valley Border Wall Waivers are *ultra vires* and unlawful because they exceed the limited grant of authority for such waivers contained in IIRIRA Section 102.  Moreover, any interpretation of Section 102 that would sanction the issuance of the Lower Rio Grande Valley Border Wall Waivers would render this statutory provision so broad and unbounded in scope that it would run afoul of Constitutional principles including the Take Care Clause, the Separation of Powers Doctrine, the Non-Delegation Doctrine, and the Presentment Clause.

3.     Section 102 of IIRIRA directed the DHS Secretary to "install additional physical barriers and roads . . . in areas of high illegal entry."  IIRIRA § 102(a).  Specifically, "in carrying out" this mandate, the DHS Secretary was required to identify and construct a total of not less than 700 miles of "reinforced fencing" where it would be "most practical and effective," as well as to complete construction of 370 miles of these border barriers within "priority areas" by

December 31, 2008.  *Id.* § 102(b).  By DHS's own admission, the projects required by Section 102 have long since been completed.

4.       In addition to IIRIRA Section 102(b)'s mandate to build certain barriers by certain dates, Section 102(c) provides that the DHS Secretary "shall have the authority to waive all legal requirements to ensure expeditious construction of the barriers and roads *under this Section*." (emphasis added).  Invoking this provision, the Lower Rio Grande Valley Border Wall Waivers purport to exempt approximately 24.6 miles of border wall construction in Cameron and Hidalgo Counties (hereafter, collectively referred to as "the Lower Rio Grande Valley Border Wall Projects") from numerous otherwise applicable environmental laws.  However, because the Lower Rio Grande Valley Border Wall Projects do not fall within the scope of projects mandated by Section 102, the projects squarely do not fall "under this section"—and, consequently, the waiver authority under Section 102(c) is inapplicable to the Lower Rio Grande Valley Border Wall Projects.

5.       Plaintiffs seek a judicial declaration that DHS Secretary Nielsen acted outside her statutory authority by issuing the Lower Rio Grande Valley Border Wall Waivers, thus rendering the Waivers *ultra vires* agency actions that are invalid and ineffective.  Specifically, the waiver provision under Section 102(c) only applies to the measures mandated by Section 102(b), which have already been completed because DHS has met its duty to identify and construct 370 miles of border barriers within "priority areas" by December 31, 2008, as required by Section 102(b)(1)(B), as well as its overlapping duty to construct a total of not less than 700 miles of border barriers as required by IIRIRA Section 102(b)(1)(A).  As such, because the scope of the IIRIRA Section 102(c) waiver provision is limited to the border barriers and road requirements specified by IIRIRA Section 102(b), the requirements of which have already been fulfilled, the

purported waiver of NEPA, the ESA, the NWRSAA, and numerous additional laws under the Lower Rio Grande Valley Border Wall Waivers are unlawful *ultra vires* acts.

6.     In the alternative, even were the Court to determine that the Lower Rio Grande Valley Border Wall Projects fall within the particular "barriers and roads" authorized under IIRIRA Section 102 and are subject to the waiver of legal requirements under IIRIRA Section 102(c), the Lower Rio Grande Valley Border Wall Waivers are invalid because the Secretary failed to comply with IIRIRA Section 102(b)(1)(C), which mandates that the DHS Secretary consult with stakeholders regarding the waivers.  Secretary Nielsen failed to comply with this requirement, thereby rendering the Lower Rio Grande Valley Border Wall Waivers both in facial violation of IIRIRA Section 102(b)(1)(c) and *ultra vires* agency actions.

7.     Additionally or in the alternative, Plaintiffs seek declaratory relief that the Lower Rio Grande Valley Border Wall Waivers, and the waiver authority provided by IIRIRA Section 102(c) generally, violate the U.S. Constitution in several respects, including the Take Care Clause, the Separation of Powers Doctrine, the Non-Delegation Doctrine, and the Presentment Clause.

## JURISDICTION

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346, 5 U.S.C. §§ 701 to 706, and 8 U.S.C. § 1103 note.  The causes of action arise under the laws of the United States and the U.S. Constitution.  The relief requested is authorized pursuant to 28 U.S.C. §§ 1651 and 2201 to 2202, and 5 U.S.C. §§ 701 to 706.

## VENUE

9.     Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(b) and (e), because the violations are occurring in this district, and a substantial part of the events or

omissions giving rise to the claims have occurred in this district due to decisions made by the Defendants, and/or failure(s) to act by the Defendants.

## PARTIES

10.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit environmental organization dedicated to the protection of native species and their habitats through science, policy, and environmental law.  The Center has more than 1.5 million members and online activists.  The Center is headquartered in Tucson, Arizona, and has an office in Washington, D.C. and numerous additional regional offices located throughout the country, and an international office in Baja California Sur, Mexico.

11.     The Center's members and staff live in or regularly visit the U.S.-Mexico borderlands region in southern Texas and the lower Rio Grande Valley, including visitation specific to Cameron and Hidalgo Counties.  The Center's members and staff regularly use the myriad federal, state, and local protected lands in this borderlands region, including areas such as the Lower Rio Grande Valley National Wildlife Refuge, the Bentsen-Rio Grande State Park, and the (privately owned) National Butterfly Center, which are impacted by and/or adjacent to the location of the Lower Rio Grande Valley Border Wall Projects, for hiking, camping, viewing and studying wildlife, photography, and other scientific, vocational and recreational activities.  The Center's members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefit from their activities in these areas.  The Center has a long history of environmental advocacy within the borderlands region generally and the south Texas borderlands region specifically.  The Center's members and staff have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

12.     The Center has worked for nearly two decades to oppose environmentally harmful border fencing and other injurious border security projects along the U.S.-Mexico border generally, and the south Texas region specifically.  The Center also has a long history of advocating for the protection of rare wildlife habitat and specific species that could be impacted by the Lower Rio Grande Valley Border Wall Projects, including the ocelot, jaguarundi, and aplomado falcon.

13.     The Center's and its members' interests are harmed by DHS's violations of law and the U.S. Constitution.  The proposed Lower Rio Grande Valley Border Wall Projects entail the construction of new border fencing and roads as well as associated noise, lighting, and other impacts, which will necessitate new land clearing, grading, staging, and other associated activities impacting the surrounding environment.  The construction—which will occur without the benefit of compliance with NEPA, the ESA and other laws—will negatively impact the wildlife habitat and imperiled species described above, which will injure the Center and its members' aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests in those habitats and species.  These injuries would be redressed by the requested relief, as absent the Lower Rio Grande Valley Border Wall Waivers, the harmful construction either would not occur or would only occur after compliance with the requirements of NEPA, the ESA and other laws, which are designed to eliminate, reduce and/or mitigate the negative environmental consequences of federal agency actions.

14.     Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a national nonprofit conservation organization focused on wildlife and habitat conservation across the country. Based in Washington D.C., the organization also maintains six regional field offices and represents more than 1.8 million members and supporters in the United States and around the

world, including approximately 90,450  in Texas.  Defenders' mission is to conserve all native plant and animals in their natural communities. Through policy, advocacy, science, and litigation, Defenders works to preserve species and the habitats upon which they depend. Defenders is deeply engaged in management of public lands, waters and wildlife, including the protection and recovery of flora and fauna in the Lower Rio Grande Valley. Defenders has been closely involved in policy and litigation matters associated with border wall construction along the United States-Mexico border for more than a decade.

15.     Defenders has organizational and membership-based interests in the preservation and conservation of the borderlands of the southwestern United States that will be harmed by the construction of barriers and roads at issue in this case.  Defenders has worked for the protection of borderland wildlife, wildlands and ecosystems for decades. Defenders has a particularly long history of advocating for proper management of the National Wildlife Refuge System, including Santa Ana and Lower Rio Grande Valley National Wildlife Refuges and the diverse species that depend on these public lands, which would be impacted by the Lower Rio Grande Valley Border Wall Projects. Defenders has played a leading role in efforts to educate the public and advocate for better integration of environmental considerations into immigration policy generally, and into border security efforts specifically.

16.     Defenders' members live near and regularly visit the borderlands in south Texas and the lower Rio Grande Valley for wildlife observation, recreation, and other uses.  Defenders' members also live in other areas along the Texas borderlands adversely impacted by the border wall projects in Cameron and Hidalgo Counties.  These members have aesthetic, educational, professional, health, and spiritual interests that will be harmed by the environmental impacts that will result from the DHS Secretary's decision to waive multiple laws, and consequently

eliminate the procedural and substantive protections that would have otherwise been provided by these laws.

17.     Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a nonprofit 501(c)(3) organization with more than 200,000 members and supporters, including many whom live in Texas.  ALDF represents its members' interests by working to protect the lives and interests of animals, including wildlife, through the legal system. ALDF is headquartered in Cotati, California, with regional offices in Los Angeles and Portland, Oregon. ALDF also has staff who are based in Texas.

18.     ALDF has an organizational and membership-based interest in ensuring the letter and spirit of wildlife- and wildland-protection statutes are fully upheld and the constitutional principles enabling these laws' implementation are respected.  ALDF pursues its purpose of safeguarding animal welfare in part by persistently advocating for government adherence to wildlife-protection laws such as NEPA, the ESA and the Migratory Bird Treaty Act (to name a few)—each of which has been waived by the DHS Secretary in conjunction with the Lower Rio Grande Valley Border Wall Projects.  ALDF has expended significant organizational resources on advocacy and public education efforts to improve environmental protections for wildlife living on protected lands such as the borderlands at issue here, and will continue to do so if the border wall is built without adherence to the laws the DHS Secretary is attempting to waive.

19.     ALDF's members live in or regularly visit the U.S.-Mexico borderlands region in south Texas.  ALDF's members regularly use the myriad federal, state, and local protected lands along the U.S.-Mexico border in south Texas generally and Cameron and Hidalgo Counties specifically—including areas impacted by and/or adjacent to the location of the Lower Rio Grande Valley Border Wall Projects—for hiking, camping, wildlife viewing and photography,

and other vocational and recreational activities.   ALDF's members derive recreational, educational, and aesthetic benefit from their activities in these areas.  ALDF's members have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.

20.     ALDF has an established track record of active participation in the oversight of government activities and decision-making, particularly with regard to laws and policies affecting wildlife.  ALDF expends considerable organizational resources in doing so, including costs associated with litigation and educating the public.   ALDF regularly represents its members' interests in this regard by filing lawsuits, training law students and professionals, and publishing and disseminating informational materials to its members.

21.     ALDF and its members are harmed by the DHS Secretary's issuance of the Lower Rio Grande Valley Border Wall Waivers, in that the DHS Secretary's decision to waive the procedural and substantive protections of multiple laws in order to expedite the construction of barriers and roads associated with the Lower Rio Grande Valley Border Wall Projects pose an imminent impact on the local ecosystems, including wildlife populations.  These impacts will directly harm ALDF's members' aesthetic and recreational interests in their continued enjoyment of the south Texas borderlands, and will additionally harm ALDF as an organization due to the forced diversion of ALDF resources to protect the wild animals affected by the illegal border wall construction in fulfillment of its mission.

22.     Defendant KIRSTJEN M. NIELSEN, Secretary of the U.S. Department of Homeland Security, is sued in her official capacity.  Secretary Nielsen is the official ultimately responsible under federal law for ensuring that the actions and management decisions of the Department, including its component agency the U.S. Customs and Border Protection ("CBP")

comply with all applicable laws and regulations.  On October 10, 2018 and October 11, 2018, Secretary Nielsen invoked the IIRIRA Section 102(c) waiver authority to issue the Cameron County and Hidalgo County waivers, respectively, in relation to the Lower Rio Grande Valley Border Wall Projects.

23.     Defendant U.S. DEPARTMENT OF HOMELAND SECURITY is an agency within the executive branch of the U.S. government.  The Department is responsible for ensuring border security along the U.S.-Mexico border consistent with applicable legal requirements.

## STATUTORY BACKGROUND

A.     **Section 102 of The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")**

24.     Congress initially enacted IIRIRA in 1996 to, for the first time, provide federal agencies with specific direction regarding the location and extent of specific border barriers to be constructed.  P.L. 104-208, div. C., codified at 8 U.S.C. § 1103 note.   Prior to IIRIRA's enactment, the authority to construct border barriers derived from the general statutory responsibility of the U.S. Attorney General (now the DHS Secretary) to "guard the boundaries and borders of the United States against the illegal entry of aliens."  Immigration and Nationality Act, §103(a)(5), 8 U.S.C. §1103(a)(5).  That authority continues to exist independent of IIRIRA.

25.     While it has been amended several times, IIRIRA Section 102 remains the primary federal statutory provision addressing border barriers.   Section 102(a) remains substantively the same as originally enacted in 1996, providing the Attorney General (now the DHS Secretary) with the general policy direction to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."

26.     At the time Section 102(a) was enacted, Congress also provided that "to the extent the Attorney General determines necessary to ensure *expeditious construction of the barriers and roads under this Section*" (emphasis added), the requirements of the ESA and NEPA may be waived.

27.     As originally enacted, IIRIRA Section 102(b) "carr[ied] out subsection (a)" by identifying specific border barriers to be constructed, establishing specific deadlines for the construction of such barriers, and other requirements.  The only border fence segment initially mandated by Congress under IIRIRA Section 102(b) was the construction of fencing in San Diego, California—specifically, the fortification of a 14-mile long "primary" border fence that was completed in 1993.  As originally enacted, IIRIRA did not mention construction related to the Texas border.

28.     The modifier "under this Section" in IIRIRA Section 102(c) refers solely to the specific border fencing required under IIRIRA Section 102(b), which by its plain language "carries out" DHS's general authority to ensure the "expeditious construction" of "additional physical barriers and roads" under IIRIRA Section 102(a).

**B.     The 2005 REAL ID Act Amendments to IIRIRA Section 102(c)**

29.     Enacted in 2005, Section 102 of the REAL ID Act amended the Section 102(c) IIRIRA waiver provision in two primary ways.  P.L. 109-13, div. B.

30.     First, the REAL ID Act amendment expanded the IIRIRA Section 102(c) waiver authority beyond NEPA and the ESA to permit the DHS Secretary "to waive *all legal requirements* [that] such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this Section" (emphasis added). This amendment did not specify the laws that Congress authorized the Secretary to waive.

31.     Second, Section 102 of the REAL ID Act amended the waiver authority under IIRIRA Section 102(c) to restrict judicial review concerning any waiver decision in the following respects: (i) purporting to limit "all causes or claims" arising from any waiver determination made by the DHS Secretary to alleged constitutional violations only; (ii) requiring any such constitutional challenge to be filed not later than 60 days after the Secretary's determination, effective upon being published in the Federal Register; and (iii) eliminating appellate court review of the district court's decision on the alleged constitutional violations and instead only permitting review upon a writ of certiorari to the U.S. Supreme Court.

32.     Congress intended the REAL ID Act's amendment and expansion of the Section 102(c) waiver authority, like the IIRIRA Section 102(c) waiver authority as originally enacted in 1996, to apply to the specific border barrier and road requirements at IIRIRA Section 102(b), which "carries out" the general border barrier policy direction at IIRIRA Section 102(a).  At that time, the only specific border barriers required under Section 102(b) remained the 14-mile San Diego, California fence proposals, with no mention of fencing in any other state, including Texas.  Congress's intent—that the expansion of the IIRIRA Section 102(c) waiver authority under Section 102 of the REAL ID Act be limited to the specific San Diego border barriers mandated by IIRIRA Section 102(b)—is evidenced by the bill's plain language, as well as statements by the bill's author and co-sponsors during the limited House Floor debate.

33.     Indeed, the bill's official title made clear that Congress's intent in expanding the IIRIRA Section 102(c) waiver authority was specific to the border barrier segments identified under Section 102(b): "To establish and rapidly implement regulations for State driver's license and identification document security standards, to prevent terrorists from abusing the asylum

laws of the United States, to unify terrorism-related grounds for inadmissibility and removal, *and to ensure expeditious construction of the San Diego border fence*." (emphasis added).

34.    The intended limitation of the IIRIRA Section 102(c) waiver authority to the San Diego double and triple layered fence specified under IIRIRA Section 102(b) was also repeatedly emphasized by the bill's supporters on the House Floor.  As stated by the bill's author:

> [T]he REAL ID Act will waive Federal laws *to the extent necessary to complete gaps in the San Diego border security fence*, which is still stymied 8 years after congressional authorization.

151 Cong. Rec. H454 (daily ed., Feb. 9, 2005) (Statement of Rep. Sensenbrenner) (emphasis added); *see also* Cong. Rec. H471 ("H.R. 418 provides the Secretary of Homeland Security with authority to waive environmental laws, *so that the border fence running 14 miles east from the Pacific Ocean at San Diego may finally be completed*.") (daily ed., Feb. 9, 2005) (Statement of Rep. Hoekstra) (emphasis added).  No legislation or legislative history mentions the application of IIRIRA Section 102(c) waiver authority to apply to any border wall construction in Texas.

**C.**    **The 2006 Secure Fence Act Amendments to IIRIRA Section 102(b)**

35.    President George W. Bush signed the Secure Fence Act on October 26, 2006. P.L. 109-367.

36.    Section 3 of the Secure Fence Act ("Construction of Fencing and Security Improvements in Border Area from Pacific Ocean to Gulf of Mexico") significantly expanded upon IIRIRA Section 102(b).  Under the Secure Fence Act amendments to IIRIRA Section 102(b), Congress removed the provisions referring specifically to the 14-miles of fencing in San Diego and instead directed DHS to "provide for at least 2 layers of reinforced fencing [and] the installation of additional physical barriers, roads, lighting, cameras, and sensors" in five specific

segments along the U.S.-Mexico border totaling approximately 850 miles.  Former IIRIRA §102(b)(1)(A)(i)-(v).

37.     Section 3 of the Secure Fence Act further amended IIRIRA Section 102(b) to add the specific requirement that two of these segments—the California and Arizona segment and one Texas segment—be considered "priority areas," with construction deadlines of May 30, 2008 and December 31, 2008.  Former IIRIRA § 102(b)(1)(B)(i)-(ii).  The Texas segments authorized by the Lower Rio Grande Valley Border Wall Waivers were not categorized as priority areas.

38.     Congress did not specifically address the impact of the Secure Fence Act amendments on the scope of the IIRIRA Section 102(c) waiver.

**D.     The 2008 Consolidated Appropriations Act Amendments to IIRIRA Section 102(b)**

39.     Just over a year after enactment of the Secure Fence Act, President George W. Bush signed the 2008 Consolidated Appropriations Act on December 26, 2007.  P.L. 110-161, div. E.

40.     In a third and final amendment to date, Section 564 of the 2008 Consolidated Appropriations Act amended Section 102(b) of the IIRIRA to scale back DHS's duties with respect to border barriers and roads as defined under the 2006 Secure Fence Act amendments.  These modifications—which remain the law to date—include: (i) eliminating the requirement that border barriers be built in any specific locations, and instead specifying that such barriers be placed "along not less than 700 miles of the southwest border where fencing would be most practical and effective"; (ii) eliminating the requirement of double-layered fencing; and (iii) amending the "priority areas" requirement to direct that DHS identify and construct 370 miles of border barriers by December 31, 2008.  IIRIRA § 102(b)(1)(A)-(B).

41.     The 2008 Appropriations Act also added a new consultation requirement to IIRIRA Section 102(b), mandating the DHS Secretary to consult with "the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites where" border barriers are constructed.  IIRIRA § 102(b)(1)(C).

42.     There have been no amendments to IIRIRA Section 102 since the 2008 Appropriations Act amendment was signed into law.

**E.     IIRIRA Section 102, As Amended**

43.     The relevant Sections of IIRIRA Section 102, codified at 8 U.S.C. § 1103 note, in its current version to date provide:

> **(a) In general.--**The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.
> **(b) Construction of fencing and road improvements along the border.—**
>     **(1) Additional fencing along southwest border.—**
>         **(A)  Reinforced fencing.--**In carrying out subsection (a) [of this note], the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.
>         **(B)  Priority areas**.--In carrying out this Section [Pub. L. 104-208, Div. C, Title I, § 102, Sept. 30, 1996, 110 Stat. 3009-554, which amended this Section and enacted this note], the Secretary of Homeland Security shall—
>             (i)     identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

   **(ii)** not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

  **(C)** **Consultation.**

   (i) **In general.--**In carrying out this Section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed

   **(ii)** **Savings provision.--**Nothing in this subparagraph may be construed to—

    **(I)** create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

    **(II)** affect the eminent domain laws of the United States or of any State.

  **(D)** **Limitation on requirements.--**Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location.

\*     \*     \*

**(c) Waiver.—**

 **(1)** **In general.--**Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this Section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

 **(2)** **Federal court review.—**

  **(A)** **In general.--**The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

  **(B)** **Time for filing of complaint.--**Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland

16

Security. A claim shall be barred unless it is filed within the time specified.

(C) **Ability to seek appellate review.--**An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.

## FACTUAL BACKGROUND

**A.     Past Construction of Border Barriers and Use of the Waiver Authority Under IIRIRA**

44.     Since IIRIRA was enacted in 1996, the federal government has spent billions of dollars to implement the statute and create the many roads and barriers and undertake other measures that Congress has specifically directed in amended versions of Section 102(b).  During the George W. Bush administration, the DHS Secretary invoked the Section 102(c) waiver authority on five occasions, to expedite border wall projects that had been specifically mandated by Congress pursuant to Section 102(b): (i) San Diego, California (70 Fed. Reg. 55,622 (Sept. 22, 2005); (ii) Barry M. Goldwater Range, Arizona (72 Fed. Reg. 2,535 (Jan. 19, 2007)); (iii) San Pedro Riparian National Conservation Area, Arizona (72 Fed. Reg. 60,870 (Oct. 26, 2007)); (iv) Hidalgo County, Texas (73 Fed. Reg. 19,077 (April 3, 2008)), and (v) Various Areas in California, Arizona, New Mexico, and Texas.  73 Fed. Reg. 18,293 (April 3, 2008), as amended, 73 Fed. Reg. 19,078 (April 8, 2008).

45.     Collectively, from 2005 to 2008, these five waivers suspended the applicability of environmental and numerous other laws that otherwise would have applied to approximately 624.5 linear miles of border barrier and related road construction.  As of February 2017, DHS has constructed 654 miles of "primary" border barriers and approximately 5,000 miles of roads along the U.S.-Mexico border.

46.     Clearly, DHS has taken aggressive action to comply with Congress's IIRIRA mandates in order to "ensure expeditious construction" of the specific barriers and roads mandated by IIRIRA Section 102(b), identified by Congress as necessary to carry out DHS's general authority to construct border barriers and roads.

47.     Consequently, DHS has fulfilled its statutory responsibilities to construct the specific "fencing and road improvements along the border" as currently defined by IIRIRA Section 102(b).

48.     In particular, DHS has met its specific mandate to identify and construct 370 miles of border fencing in "priority areas . . . where fencing would be most practical and effective."  IIRIRA § 102(b)(1)(B).

49.     Separately, DHS has also met its specific mandate to "construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective."  IIRIRA § 102(b)(1)(A).  In addition to the 654 miles of primary fencing constructed by DHS, the agency has constructed an additional 37 miles of double-layered fencing and 14 miles of triple-layered fencing, totaling 705 miles of reinforced border fencing, exceeding the 700-mile minimum under IIRIRA Section 102(b)(1)(A).

50.     As summarized recently by the GAO:

> From fiscal years 2005 through 2015, CBP increased the total miles of primary border fencing on the southwest border from *119 miles to 654 miles*—including 354 miles of primary pedestrian fencing and 300 miles of primary vehicle fencing.  With 654 miles of primary fencing currently deployed, CBP officials have stated that CBP is in compliance with its legal requirements for the construction of the southwest border fencing on the substantial discretion provided to the Secretary of Homeland Security to determine the appropriate placement of fencing.

Government Accountability Office, No. 17-331, *Southwest Border Security: Additional Actions*

*Needed to Better Assess Fencing's Contributions to Operations and Provide Guidance for Identifying Capability Gaps* 8 (Feb. 2017), at https://www.gao.gov/assets/690/682838.pdf (emphasis added).

51.     Further, there have been no amendments to IIRIRA Section 102 since the 2008 Amendment was signed into law authorizing any legal waivers for additional construction projects outside those projects specifically authorized and contemplated when it was enacted.

**B.     The Lower Rio Grande Valley Border Wall Waivers**

52.     On January 25, 2017, President Donald J. Trump issued Executive Order No. 13767, entitled "Border Security and Immigration Enforcement Improvement" ("Executive Order"), which directed DHS to construct a "secure, contiguous, and impassable physical barrier" along the entirety of the nearly 2,000 mile-long U.S.-Mexico border.

53.     Prior to the Executive Order, *all* previous waivers invoked under Section 102(c) of IIRIRA were for projects *required* under Section 102(b).  Subsequent to the Executive Order, the Trump administration DHS Secretary has now issued five waivers—all for projects *outside* the scope of Section 102(b).  Two of those waivers concern projects in California and are subject to ongoing litigation, the third is subject to ongoing litigation in this Court, and the two most recent are the Lower Rio Grande Valley Border Wall Waivers.

//


//


//



*Figure 1. Map of Proposed Construction related to Cameron County Waiver*

54.     On October 10, 2018, Secretary Nielsen issued a Determination in the Federal Register purporting to invoke IIRIRA Section 102(c) in order to waive the application of NEPA, the ESA, the NWRSAA, and numerous additional laws otherwise applicable to "the construction of roads and physical barriers" in 11 different areas of Cameron County, Texas, totaling approximately 6.6 miles of linear border.  83 Fed. Reg. 50,949.  The map of the proposed construction related to the Cameron County Waiver is in Figure 1, above.

55.     On October 11, 2018, Secretary Nielsen issued a separate Determination in the Federal Register purporting to invoke IIRIRA Section 102(c) in order to waive the application of NEPA, the ESA, the NWRSAA, and numerous additional laws otherwise applicable to "the

construction of roads and physical barriers" in 6 different areas of Hidalgo County, Texas, totaling approximately 18 miles of linear border.  83 Fed. Reg. 51,472.  The map of the proposed construction related to the Hidalgo County Waiver is in Figure 2, below.



*Figure 2.  Map of Proposed Construction related to Hidalgo County Waiver*

56.     In each of the Lower Rio Grande Valley Border Wall Waivers, Secretary Nielsen purportedly waived "in their entirety" the following federal statutes with respect to the Lower Rio Grande Valley Border Wall Projects:

    i.      National Environmental Policy Act, 42 U.S.C. § 4231 *et seq.*;

    ii.     Endangered Species Act, 16 U.S.C. 1531 *et seq*;

iii.     Clean Water Act, 33 U.S.C. § 1251 *et seq.*;

iv.     National Historic Preservation Act, Pub. L. 89-665;

v.     Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*;

vi.     Migratory Bird Conservation Act, 16 U.S.C. § 715 *et seq.*;

vii.     Clean Air Act, 42 U.S.C. § 7401 *et seq.*;

viii.     Archaeological Resources Protection Act, 16 U.S.C. § 470aa *et seq.*

ix.     Paleontological Resources Preservation Act, 16 U.S.C. § 470aaa *et seq.*;

x.     Federal Cave Resources Protection Act of 1988, 16 U.S.C. § 4301 *et seq.*;

xi.     Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*;

xii.     Noise Control Act, 42 U.S.C. § 4901 *et seq.*;

xiii.     Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*,

xiv.     Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*;

xv.     Archaeological and Historic Preservation Act, 54 U.S.C. § 320301 *et seq.*;

xvi.     Antiquities Act, 54 U.S.C. § 320301 *et seq.*;

xvii.     Historic Sites, Buildings, and Antiquities Act, 54 U.S.C. § 3201-320303 & 320101-320106;

xviii.     Farmland Protection Policy Act, 7 U.S.C. § 4201 *et seq.*;

xix.     Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.*;

xx.     Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*;

xxi.     National Wildlife Refuge System Administration Act, 16 U.S.C. §§ 668dd-668ee;

xxii.     National Fish and Wildlife Act of 1956, 16 U.S.C. § 742a *et seq.*;

xxiii.    Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.*;

xxiv.    Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*;

xxv.     Rivers and Harbors Act of 1899, 33 U.S.C. § 403

xxvi.    Eagle Protection Act, 16 U.S.C. § 668 *et seq.*;

xxvii.   Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 *et seq.*; and

xxviii.  American Indian Religious Freedom Act, 42 U.S.C. § 1996.

**C.      The Lower Rio Grande Valley Border Wall Projects**

57.     Secretary Nielsen's Lower Rio Grande Valley Border Wall Waivers purport to waive the application of NEPA, the ESA, the NWRSAA, and numerous other laws to the proposed construction of the Lower Rio Grande Valley Border Wall Projects, which would result in approximately 24.6 miles of new border wall construction in Cameron and Hidalgo Counties.

58.     The new border wall construction will consist of 18-foot tall bollard fencing atop vertical concrete river levees, bounded by a 150-foot-wide "enforcement zone" on the river-facing side of the barrier that will be cleared of vegetation.  The wall will also be accompanied by road construction for law enforcement and private property owners, and installation of 24-7 stadium-style, high-intensity lighting, cameras, and sensors.

59.     The Lower Rio Grande Valley Border Wall Projects will have numerous negative impacts on the wildlife, plants, and the sensitive biological habitats on and near the proposed site of the project.  Located at the southern tip of Texas, where the Rio Grande meets the Gulf of Mexico, the Valley is situated at the confluence of the Central and Mississippi flyways where coastal, temperate, desert and subtropical systems converge, harboring more than 1,200

documented plant species, over 500 bird species, more than 300 butterfly species as well as a wide diversity of other wildlife.

60.     In several areas, the Lower Rio Grande Valley Border Wall Projects (both Cameron and Hidalgo Counties) include border wall and associated construction within the Lower Rio Grande Valley National Wildlife Refuge ("Refuge") without compliance with the National Wildlife Refuge System Administration and other laws.  Established in 1979 in an effort to preserve the valley's rapidly disappearing native habitat, the Refuge follows the Rio Grande upstream from the Gulf of Mexico for 275 river miles.  The Refuge is currently comprised of more than 100 parcels of valley habitat totaling approximately 100,000 acres, connecting otherwise isolated state parks, private conservation properties, federal lands, and other land ownerships. Known as the "Wildlife Corridor," the Refuge is essential to conserving the rich biodiversity of the Rio Grande Valley, benefiting unique riparian plant communities, rare migratory birds and imperiled species such as the endangered ocelot. The proposed border wall construction will bisect and fragment the Refuge, effectively sealing off vital habitat from the rest of the United States and causing extensive damage to the wildlife corridor along the river.

61.     Further, the Hidalgo County Border Wall Waiver authorizes border wall and associated construction within Bentsen-Rio Grande State Park ("State Park"), which also includes the headquarters of the World Birding Center.  The State Park consists of remnant native ebony trees and other highly imperiled native vegetation, and is renowned for the tropical birds, butterflies, and dragonflies that inhabit its boundaries.  Border wall construction will likely bifurcate the State Park, with the headquarters and visitor center located north of the wall and the remainder of the park that is used by the public located south of the wall.  The Texas Parks and

Wildlife Department has informed DHS that it could be forced to close the State Park in the event this scenario occurs, due to management and safety issues.

62.     Moreover, the Hidalgo County Border Wall Waiver authorizes border wall and associated construction within the National Butterfly Center, a 100-acre wildlife center and native species botanical garden which contains trails for exploring, observation areas, educational exhibits, and a plant nursery.  The National Butterfly Center's primary focus is educating the public about the value of biodiversity, the beauty of the natural world, and the wonder of butterflies and the role they play in maintaining healthy ecosystems and sustainable food resources.  Like Bentsen-Rio Grande State Park, proposed border wall construction will likely bifurcate the National Butterfly Center, with its infrastructure located north of the wall and the remainder of the center that is used by the public located south of the wall.

63.     Furthermore, the construction of the Lower Rio Grande Valley Border Wall Projects, including the associated construction or installation of roads, gates, bridges, and staging areas, and excavation and site preparation, will directly destroy thousands of acres of native vegetation, causing the permanent loss of wildlife and their habitat.  Under the Lower Rio Grande Valley Border Wall Waivers, DHS has not and will not properly consider these and myriad other negative environmental impacts of the projects, including whether there are reasonable alternatives that might avoid or mitigate such impacts.

64.     In addition to the direct destruction of wildlife habitat, the Lower Rio Grande Valley Border Wall Projects' proposed construction of more than 24 miles of new border wall will block migration routes and cross-border movement of the many species that rely on habitat on both sides of the U.S.-Mexico border, preventing the genetic exchange necessary to maintain or restore healthy wildlife populations, including for endangered species such as the ocelot. The

proposed border barriers will also exacerbate flooding by altering water flows and related hydrologic processes, trapping wildlife behind the levee wall to drown or starve during flood events.

65.     The Lower Rio Grande Valley Border Wall Projects are major construction projects that pose significant negative threats to wildlife, their habitats, and the greater surrounding ecosystem.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### *Ultra Vires* Violations under IIRIRA Section 102(c)

66.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

67.     Secretary Nielsen's Lower Rio Grande Valley Border Wall Waivers cite Section 102 of IIRIRA as authority for construction of the Lower Rio Grande Valley Border Wall Projects.

68.     IIRIRA Section 102(c) provides the DHS Secretary with "the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this Section."  8 U.S.C. § 1103 note.

69.     The scope of the IIRIRA Section 102(c) authority, granted to the DHS Secretary, to waive laws "under this Section" is limited to the specific border barriers and roads required to be constructed pursuant to IIRIRA Section 102(b).  While IIRIRA Section 102(a) provides general policy direction to the DHS Secretary to construct border barriers and roads in "areas of high illegal entry" into the United States, IIRIRA Section 102(b) identifies the specific "construction of fencing and road improvements along the border" necessary to "carry[] out subsection (a)."

70.     At the time of the original 1996 enactment of IIRIRA, as well as its 2005 amendment by Section 102 of the REAL ID Act, the specific border barrier construction required under IIRIRA Section 102(b) was limited solely to the San Diego 14-mile double and triple layer border fence.

71.     Congress subsequently amended IIRIRA Section 102(b) under the 2006 Secure Fence Act and 2008 Consolidated Appropriations Act.  The 2006 Secure Fence Act amended IIRIRA Section 102(b) to require DHS to construct five specific segments of double-layered border fencing totaling approximately 850 miles.  One year later, with the enactment of the 2008 Consolidated Appropriations Act, Congress again amended IIRIRA Section 102(b) to its current version, which requires that DHS identify and construct 370 miles of border barriers *by December 31, 2008*, and that the agency construct border barriers "along not less than 700 miles of the southwest border where fencing would be most practical and effective."

72.     DHS has met its duty to identify and construct 370 miles of border barriers within "priority areas" by December 31, 2008 as required by IIRIRA Section 102(b)(1)(B), as well as its duty to construct a total of not less than 700 miles of border barriers as required by IIRIRA Section 102(b)(1)(A).  In addition to the 654 miles of primary fencing constructed by DHS, the agency has constructed an additional 37 miles of double-layered fencing and 14 miles of triple-layered fencing, totaling 705 miles of reinforced border fencing, exceeding the 700-mile minimum under IIRIRA Section 102(b)(1)(A).

73.     Because the scope of the IIRIRA Section 102(c) waiver provision is limited to the border barriers and road requirements specified by IIRIRA Section 102(b), the requirements of which have already been fulfilled, the purported waivers of NEPA, the ESA, the NWRSAA, and

numerous additional laws under the Lower Rio Grande Valley Border Wall Waivers are unlawful *ultra vires* acts.

74.    Due to fact that the Lower Rio Grande Valley Border Wall Projects are not subject to the scope of the IIRIRA Section 102(c) waiver authority, DHS Secretary Nielsen's purported waiver of laws under the Lower Rio Grande Valley Border Wall Waivers is an unlawful *ultra vires* act, which the Court should vacate.

**SECOND CLAIM FOR RELIEF**
**Constitutional Violation**
**Violation of the Take Care Clause of the U.S. Constitution**
**Article II, Section 3**

75.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

76.    Under IIRIRA Section 102(c), and subject to the *ultra vires* restrictions described in the First Claim for Relief, once the DHS Secretary invokes the waiver authority, the "only cause or claim" that may be brought arising from the waiver is one "alleging a violation of the Constitution of the United States."  IIRIRA Section 102(c) further  provides that "[t]he district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any" such action, which "shall be filed not later than 60 days after the date of action or decision" at issue."  IIRIRA § 102(c)(2)(A)-(C).

77.    Article II of the U.S. Constitution provides that "The executive Power shall be vested in a President," and that he or she "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

78.    Among the laws that the Take Care Clause mandates be "faithfully executed" are the conditions and limitations of IIRIRA Section 102 itself.  Among the conditions and limitations of IIRIRA Section 102 are the geographical and temporal restrictions for barrier construction, along with the requirements for consultation with affected entities under Section

102(b), and the restriction on waiver authority under Section 102(c) to the "expeditious construction of the barriers and roads" otherwise authorized by the statute under Section 102(b).

79.     DHS Secretary Nielsen's purported waivers of NEPA, the ESA, the NWRSAA, and numerous additional laws under the Lower Rio Grande Valley Border Wall Waivers failed to comply with the requirements and limitations of IIRIRA Section 102, a law that the Executive Branch is required to "faithfully execute."   Accordingly, the Lower Rio Grande Valley Border Wall Waivers violate the U.S. Constitution.  U.S. Const. art. II, § 3.

### THIRD CLAIM FOR RELIEF
### Constitutional Violation
### Violation of the Non-Delegation and Separation of Powers Doctrine
### Article I, Section 1

80.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

81.     "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government."  *Mistretta v. United States*, 488 U.S. 361, 371 (1989).

82.     Article I, Section 1 of the U.S. Constitution directs that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."

83.     Article II, Section 1 of the U.S. Constitution directs that "[t]he executive Power shall be vested in a President of the United States of America."

84.     Under these constitutional provisions, Congress may not delegate legislative authority to an executive branch agency, or in the case of IIRIRA Section 102(c), may not delegate legislative authority to an individual executive branch official.  *Loving v. U.S.*, 517 U.S., 748, 758 (1996).

85.     As part of the fundamental doctrine of the Separation of Powers, the Supreme Court "has invalidated attempts by Congress to exercise the responsibilities of other Branches or

to reassign powers vested by the Constitution in either the Judicial Branch or the Executive Branch." *Mistretta*, 488 U.S. at 380.

86.     IIRIRA Section 102(c) unconstitutionally delegates to the Executive Branch, namely the DHS Secretary, the legislative power to waive the application of any Congressionally-enacted law to construction on the U.S.-Mexico border.

87.     The only guidance Congress provided to the Executive Branch was that the waiver should be exercised to the extent the DHS Secretary "determines necessary to ensure expeditious construction of the barriers and roads under this Section."  Thus, Section 102(c) permits the DHS Secretary to make legislative decisions without an intelligible general policy to guide her decision-making.

88.     Therefore, IIRIRA violates Article I, Section 1 of the U.S. Constitution and the Non-delegation Doctrine and Separation of Powers Doctrine, thereby rendering DHS's reliance on IIRIRA to support its Lower Rio Grande Valley Border Wall Waivers unconstitutional.

### FOURTH CLAIM FOR RELIEF
### Constitutional Violation
### Violation of the Presentment Clause
### Article I, Section 7

89.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

90.     Article I, Section 7 of the Constitution provides that any federal statute must pass both houses of Congress, and "before it become a Law, be presented to the President of the United States: If he[/she] approve he shall sign it, but if not he shall return it, with his Objections to that House it which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it."

91.     The "[a]mendment and repeal of statutes, no less than enactment," must conform with the presentment and bicameralism requirements of Article I.  *INS v. Chadha*, 462 U.S. 919,

954 (1983).  Specifically, the Supreme Court has stated that the Executive Branch cannot void any law without Congress passing a law voiding the previous law and presenting it to the President for signature.  *Clinton v. City of New York*, 524 U.S. 417 (1998).

92.     IIRIRA Section 102(c), as written, is facially invalid because it vests unilateral power in the DHS Secretary to waive the application of any laws in areas along the border for purposes of building border walls without Congress passing a law to void the specific laws at issue or limit their application, and presenting it to the President, as required by Article I, Section 7 of the U.S. Constitution.

93.     Separately, the statute is also invalid as applied to this case.  The Lower Rio Grande Valley Border Wall Waivers purported to waive NEPA, the ESA, the NWRSAA, and numerous other laws that would otherwise apply to the Lower Rio Grande Valley Border Wall Projects at issue in this litigation.  In so doing, Secretary Nielsen chose which laws to waive and which laws to obey, without an act of Congress specifying which particular law or set of laws could be waived and without the presentation of said Congressional act to the President.

94.     The IIRIRA Section 102(c) waiver authority generally, and DHS Secretary Nielsen's Lower Rio Grande Valley Border Wall Waivers specifically, are unconstitutional infringements upon the lawmaking procedures required under Article I, Section 7 of the Constitution.

**FIFTH CLAIM FOR RELIEF**
**In the Alternative, Violation of IIRIRA Section 102(b)(1)(C)**
**as a Requirement to Using Waiver Authority under IIRIRA Section 102(c)**

95.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

96.     In the alternative, to the degree the Court finds that the Lower Rio Grande Valley Border Wall Projects do constitute "barriers and roads" under IIRIRA Section 102, and are thus

subject to waiver of legal requirements under IIRIRA Section 102(c), Plaintiffs challenge Secretary Nielsen's Lower Rio Grande Valley Border Wall Waivers as invalid because the Secretary failed to conduct necessary prerequisites for exercising the waiver authority for expedited construction as set forth in provision IIRIRA Section 102(b)(1)(C).

97.     IIRIRA Section 102(b)(1)(C) requires the DHS Secretary, *prior* to taking actions to carry out IIRIRA, to:

> consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

98.     IIRIRA Section 102 itself is not included among the statutes waived by the Secretary in the Lower Rio Grande Valley Border Wall Waivers.  Rather, Section 102(c)(1) authorizes the DHS Secretary to waive all legal requirements "[n]otwithstanding any *other* provision of law" (emphasis added).  IIRIRA Sections 102(b) is not an "other provision[s] of law" but rather part of the same law as the Section 102(c) waiver authority.

99.     The restriction on judicial review in IIRIRA Section 102(c)(2)(A) also only applies to "any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph [102(c)](1)."

100.    The requirements of IIRIRA Section 102(b), in fact, are *prerequisites* to Secretary Nielsen's exercise of the Section 102(c) waiver authority.  The requirement that the Secretary must undergo consultation with key stakeholders regarding the effects of the waiver demonstrate that such a requirement must be satisfied *prior* to the waiver issuance—and not *after*.

101.    The Lower Rio Grande Valley Border Wall Waivers are invalid because the Secretary has failed to fulfill the consultation requirement under IIRIRA Section 102(b)(1)(C).

On information and belief, the DHS Secretary has neither adequately completed consultation nor meaningfully consulted with any or all of the entities required by Section 102(b)(1)(C) prior to issuing the Lower Rio Grande Valley Border Wall Waivers.

102.    The Secretary's decisions to issue the Lower Rio Grande Valley Border Wall Waivers facially violate the requirements under IIRIRA Section 102 and are thus *ultra vires* because they are in excess of the Secretary's delegated powers by approving the waiver prior to completing at least the prerequisite consultation mandated in Section 102(b)(1)(C).  In addition or in the alternative, DHS's failures to comply with the requirements of Section 102(b)(1)(C) are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law, in violation of the Administrative Procedure Act, and are actionable thereunder.  5 U.S.C. §§ 701-706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Center for Biological Diversity, Defenders of Wildlife, and Animal Legal Defense Fund pray that this Court:

1.    Declare that DHS Secretary Nielsen's Lower Rio Grande Valley Border Wall Waivers are *ultra vires*;

2.    Declare that DHS Secretary Nielsen lacked the authority under IIRIRA Section 102(c) to waive NEPA, the ESA, the NWRSAA, and other laws in the Lower Rio Grande Valley Border Wall Waivers;

3.    Declare that the Lower Rio Grande Valley Border Wall Waivers specifically and the IIRIRA Section 102(c) waiver authority generally violate the U.S. Constitution's Take Care Clause;

4.      Declare that the Lower Rio Grande Valley Border Wall Waivers specifically and the IIRIRA Section 102(c) waiver authority generally violate the U.S. Constitution's fundamental Separation of Powers and Non-Delegation Doctrine principles;

5.      Declare that the Lower Rio Grande Valley Border Wall Waivers specifically and the IIRIRA Section 102(c) waiver authority generally violate the U.S. Constitution's Presentment Clause;

6.      Set aside and vacate the Lower Rio Grande Valley Border Wall Waivers;

7.      Enjoin DHS from implementing the Lower Rio Grande Valley Border Wall Projects until and unless it complies with all laws that would apply absent the unlawful waivers;

8.      Retain jurisdiction to ensure compliance with the Court's Orders;

9.      Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys' fees, expert fees, and costs; and

10.     Grant such other and further relief as the Court may deem just and proper.


DATED: October 18, 2018                 Respectfully submitted,

                                        */s/ Anchun Jean Su*
                                        ANCHUN JEAN SU (DC Bar No. CA285167)
                                        */s/ Howard M. Crystal*
                                        HOWARD M. CRYSTAL (DC Bar No. 446189)
                                        CENTER FOR BIOLOGICAL DIVERSITY
                                        1411 K Street N.W., Suite 1300
                                        Washington, D.C. 20005
                                        Telephone:     (202) 849-8399
                                        Email:         jsu@biologicaldiversity.org
                                                       hcrystal@biologicaldiversity.org

                                        BRIAN SEGEE (CA Bar No. 200795)*
                                        CENTER FOR BIOLOGICAL DIVERSITY
                                        660 S. Figueroa Street, Suite 1000
                                        Los Angeles, CA  90017

Telephone:     (805) 750-8852
Email:          bsegee@biologicaldiversity.org

JOHN P. ROSE (CA Bar No. 285819)*
CENTER FOR BIOLOGICAL DIVERSITY
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017-3464
Telephone:     (213) 785-5406
E-mail:          jrose@biologicaldiversity.org

*Attorneys for Plaintiff Center for Biological
Diversity*

JASON RYLANDER (DC Bar No. 474995)
DEFENDERS OF WILDLIFE
1130 Seventeenth Street, NW
Washington, D.C. 20036
Telephone:     (202) 682-9400
Email:          jrylander@defenders.org

*Attorney for Plaintiff Defenders of Wildlife*

ANTHONY T. ELISEUSON (IL Bar No.
6277427)*
ANIMAL LEGAL DEFENSE FUND
150 South Wacker Drive, Suite 2400
Chicago, Illinois 60606
Telephone:     (707) 795-2533
Email:          aeliseuson@aldf.org

*Attorney for Plaintiff Animal Legal Defense Fund*

*\*Pro hac vice application pending*